**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| ENIGMA HOLDINGS, INC. and EBUN LIMITED, <br><br>      **Plaintiffs,** <br><br>   **vs.** <br><br> TEXAS PACIFIC GROUP, TPG GIANT LLC, TPG PARTNERS III, L.P., T3 PARTNERS, L.P., and DAVID BONDERMAN, <br><br>      **Defendants.** | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> §   CIVIL ACTION NO. 3:05-CV-1168-B <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

## FIRST AMENDED COMPLAINT

Plaintiffs, Enigma Holdings Inc. ("Enigma") and Ebun Limited ("Ebun") (collectively, "Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint against Defendants, TPG Giant LLC, TPG Partners III, L.P., T3 Partners, L.P, doing business as Texas Pacific Group (collectively, "TPG"), and David Bonderman, state and allege:

## NATURE OF THE ACTION

1.  This is an action seeking damages and other relief for violation of the federal securities laws, common law and statutory fraud, aiding and abetting fraud, civil conspiracy, breach of fiduciary duty, and abuse of control. These claims arise out of a scheme by TPG and its principal, David Bonderman, to secretly acquire control of the management of Gemplus, a

world leader in the manufacture of so-called "smart cards," or credit cards embedded with computer chips, without investing in a controlling stock position in the Company, and without disclosing their control position in the Company's stock offering materials or otherwise.  TPG then exercised control over Gemplus in a manner that defrauded Plaintiffs and constituted a breach of fiduciary duty to Gemplus's shareholders, including Plaintiffs.

2.      TPG and Bonderman effectuated their undisclosed control of Gemplus through, among other things, a secret Shareholders' Agreement that TPG entered into with two other significant shareholder groups, the Quandt family and the founder of the Company, Marc Lassus, prior to the Company's December 2000 initial public offering ("IPO").  The effect of the Shareholders' Agreement was to give TPG *de facto* control over the Company, even though TPG only had an approximately 26% ownership interest in the Company.

3.      The existence and effect of the Shareholders' Agreement and TPG's control over Gemplus were concealed by and at the direction of TPG and Bonderman when Plaintiff Enigma bought shares in Gemplus prior to Gemplus's IPO, and when Plaintiff Ebun bought shares and ADSs on the market following the IPO.  The disclosure documents filed by Gemplus for the public offering, including a Registration Statement filed with the U.S. Securities and Exchange Commission on Form F-1 (the "Registration Statement"), and a Gemplus Prospectus Definitif, filed with the French securities regulation authorities, were written at the direction and control of TPG in the United States and abroad.  These documents were materially false and misleading in that, among other things, they omitted any disclosure of TPG's actual or intended control over Gemplus.

4.      As is alleged further below, TPG's undisclosed control over Gemplus began even before it completed its investment in Gemplus in February 2000 and continued thereafter.  TPG

masterminded this control scheme from its offices in Texas, and using consultants and other professionals located in the United States.  TPG exercised this control by, among other things, installing its employees in senior management positions without obtaining the approval of Gemplus's Board of Directors (the "Board"), and usurping control over key business functions, such as the public offering, budgeting, strategic planning, retention of consultants, proposed employee lay-offs, and the search for a new chief executive officer.  Furthermore, TPG, at the direction of Bonderman, orchestrated at least two separate transactions by Gemplus with entities in which TPG maintained significant, undisclosed financial interests, on terms highly favorable to those entities, which transactions were not in the best interests of Gemplus.  Moreover, TPG executed a plan to isolate, and ultimately to terminate, the founder of the business, Marc Lassus, which plan was never disclosed to the shareholders.  TPG thus exercised its control over Gemplus in a manner that breached its fiduciary duty to the minority shareholders of Gemplus, including Plaintiffs, and was oppressive to them.

5.      TPG's stewardship of Gemplus has been characterized by management missteps, deteriorating employee morale, a management team riven with internal conflicts, poor relations with the French labor unions, and inaccurate and misleading financial reporting.  Since its entry into the stock market in December 2000, Gemplus has had three chairmen of the Board of Directors and three CEOs.  The Company has published numerous profit warnings, the first of which was issued just months after the IPO and, in 2001, Gemplus was required to lower its sales and earnings projections on several occasions.  Gemplus's stock price and ADS price have suffered accordingly.  Gemplus entered the French exchange at €6.00 per share on December 7, 2000.  In the 52 weeks prior to November 15, 2005, Gemplus shares have ranged from a low of €1.61 to a high of €2.39.  Gemplus's ADSs began trading on NASDAQ at $13.38 per ADS and

have traded under $5.00 per ADS for most of the time since then. As of November 15, 2005, Gemplus's ADSs were trading at $4.98.

6.     TPG has also presided over Gemplus's dissemination of false and misleading material information as well as the nondisclosure of material information. It has recently been disclosed in the press that the French securities regulation authority, the Autorite des Marches Financiers (the "A.M.F."), formerly known as the Commission des Operations de Bourse (the "C.O.B."), concluded following a lengthy investigation that, under the control of TPG, Gemplus's financial disclosures from its December 2000 IPO through 2002 were materially false and misleading. In the IPO documents themselves, and in later periodic filings, Gemplus materially misrepresented two very substantial loans, each in the amount of €72 million, which were granted simultaneously to the new CEO hired by TPG, Antonio Perez, and to Marc Lassus, to enable them to acquire a total of 8% of the Company's shares. These public disclosures were materially false and misleading in that they made it appear that these loans were secured by the pledge of the shares thereby acquired when in fact they were not. The loans thus exposed Gemplus to a significant risk of loss. Furthermore, while under TPG's control, Gemplus intentionally or recklessly issued false press releases in 2001 and 2002, which misled Plaintiffs and the market in general into believing Gemplus's prospects were materially better than TPG, including Bonderman, knew them to be. Furthermore, Gemplus unduly delayed issuing corrective disclosures. As a result of such false and misleading information, Plaintiffs retained their shares and ADSs and were damaged thereby.

7.     The A.M.F. also discovered other violations of the accounting rules applicable to Gemplus, including the use of misleading definitions of profitability, the lack of any provision for the risk of nonpayment of the loans to Lassus and Perez, and the failure to disclose TPG's

self-interest in two transactions. In fact, the A.M.F. has recommended that monetary sanctions be imposed on Gemplus, two of its former CEOs and its accountants. Furthermore, the A.M.F. has referred its findings to the French criminal authorities for possible criminal prosecution.

8.     Had Plaintiffs known the true nature of TPG's domination and control over Gemplus, Plaintiffs would never have purchased Gemplus securities. Moreover, had Plaintiffs known the true condition of Gemplus's finances, Plaintiffs would have sold their Gemplus shares and ADSs. TPG and Bonderman have thus defrauded Plaintiffs, and have acted in utter disregard of their fiduciary duties to Gemplus shareholders, including Plaintiffs. As a consequence, Plaintiffs are entitled to damages in an amount to be established at trial and other relief set forth in the Prayer for Relief herein.

## PARTIES AND JURISDICTION

9.     Plaintiff Ebun is a company incorporated in the Bahamas, with its principal place of business in the Bahamas.

10.     Plaintiff Enigma is a company incorporated in the Bahamas, with its principal place of business in the Bahamas.

11.     Upon information and belief, Defendant Texas Pacific Group is the name used by a private equity investment firm, founded in 1993 by David Bonderman, who is trained as an attorney. TPG is headquartered in Fort Worth, Texas and has additional offices in San Francisco and London, among other places. Upon information and belief, TPG acted in connection with the allegations herein through a series of partnerships and affiliates, including Defendant TPG Giant LLC, a Delaware limited liability company with its principal place of business in Fort Worth, Texas; Defendant TPG Partners III, L.P., a Delaware limited partnership with its principal place of business in Fort Worth, Texas; and Defendant T3 Partners, L.P., a Delaware limited partnership with its principal place of business in Fort Worth, Texas. These entities refer

to themselves collectively as TPG in numerous internal documents, press releases and regulatory filings made by Gemplus.  Accordingly, Plaintiffs refer to these funds collectively as "TPG" in this Amended Complaint.

12.     At all relevant times, Defendant David Bonderman was the principal of TPG. Upon information and belief, David Bonderman resides in Tarrant County, Texas.

13.     This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy is in excess of $75,000 exclusive of costs and interest; and pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa; and pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all Defendants reside in Texas; and under Section 27 of the Securities Exchange Act of 1934 in that Defendants TPG and Bonderman transact substantial business in this District.  In addition, as described further herein, many of the acts, transactions, and occurrences alleged in the Amended Complaint, including the preparation and dissemination of materially false and misleading information as well as the direction of TPG's scheme to control Gemplus, including forcing Lassus out of the Company, occurred in this District.

15.     In connection with the acts alleged in this Amended Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the interstate mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

<strong><u>FACTS COMMON TO ALL COUNTS</u></strong>

**A.**     **<u>The Development of Gemplus</u>**

16.     In 1988, a French engineer, Marc Lassus, founded Gemplus under French law as a private company located in Gemenos, France.  Under Lassus's management, Gemplus pioneered

6

the "smart card" – credit card-sized cards with embedded microchips that store cardholder and transaction data.  Initially, Gemplus began using this technology in connection with pre-paid telephone cards, but subsequently expanded its business to include use in bank and credit cards and subscriber identity modules ("SIM" cards), which are used in mobile phones.  Gemplus's products include identification and financial smart cards, cards with radio-frequency chips, electronic tags, traditional magnetic strip cards and card readers.

17.     By 1999, Gemplus had become the market leader for "smart cards," with thousands of employees, factories from Singapore to Mexico, and a thirty-seven percent market share worldwide.  From 1989 to 1999, Gemplus boasted a compounded annual growth rate of forty-seven percent.

18.     Even though it was not yet a public company, because of its enormous success and prospects, Gemplus had a number of well-known private investors, including the Quandt family of Germany, who control the German luxury-carmaker Bayerische Motoren Werke AG ("BMW").  Marc Lassus held a large amount of Gemplus stock and served as its Chairman.

**B.      TPG's Initial Control of Gemplus**

19.     Upon information and belief, TPG typically acquires a majority or controlling share interest in the companies in which it invests.  With regard to Gemplus, however, TPG purchased only a minority, non-controlling share interest.  Upon information and belief, even before its February, 2000 investment in Gemplus, TPG had begun to consider the various means by which it could exercise control over Gemplus without making an investment large enough to grant it actual control.  In June 1999, Abel Halpern, a managing partner of TPG, began considering various structures for TPG's investment in Gemplus and whether these structures would allow TPG to exercise sufficient control over Gemplus and its other stockholders.

20.     In the fall of 1999, TPG sent various consultants, attorneys and accountants to Gemplus's headquarters in France to conduct due diligence for its potential investment in the Company.  Upon information and belief, TPG also positioned Andrew Dechet, a TPG managing partner, into the Gemplus management structure.  Dechet soon began directing business strategy for Gemplus, even though TPG was not yet a Gemplus shareholder, and Dechet was not an officer of Gemplus.  Upon information and belief, TPG paid Dechet's salary, and, in turn, invoiced it to Gemplus.  Even though he acted as Gemplus management, Dechet appears to have maintained a TPG based e-mail account throughout his association with Gemplus.

21.     On or around September 27, 1999, Lassus, Stephan Quandt and Abel Halpern, the managing partner of TPG's London office, met in London to discuss TPG's pending investment and Gemplus's corporate structure.  Upon information and belief, by this time, TPG had formulated a scheme whereby it would usurp control over the management and operations of Gemplus without making an investment for a majority, or controlling, block of Gemplus shares. In the course of this meeting, the participants agreed that TPG would have a chance to buy out minority shareholders at a lower price if its attempt to buy existing shares failed.

22.     In late 1999, Lassus and Allan Green, the chairman of a French investment firm which, on information and belief, was retained by Gemplus, met with David Bonderman, TPG's founder and principal, at his home in Aspen, Colorado.  In this meeting, Lassus and Bonderman agreed that Gemplus would benefit as a result of investment from a U.S. partner such as TPG. As a condition for its investment, TPG required Gemplus to reorganize the company in a manner that would be beneficial to TPG from a tax perspective. TPG prevailed upon Gemplus to create a new holding company, Gemplus International S.A. (hereinafter called "Gemplus"), incorporated in Luxembourg, and caused the formation of an affiliated Gibraltar company named Zenzus into

which TPG would make its $550 million investment. Zenzus then made a stock for stock exchange with Gemplus.

23.     Upon information and belief, in or around November of 1999, TPG, Lassus and the Quandt family entered into a TPG/Founders Term Sheet, which required Lassus to vote his shares in accordance with TPG's instructions, and would become the precursor to the Shareholders' Agreement described below. The TPG/Founders Term Sheet was drafted by TPG's legal counsel Cleary Gottlieb.

24.     As another condition for its investment, TPG required Lassus and the Quandt family to sign a Shareholders' Agreement, also drafted by TPG's legal counsel, Cleary Gottlieb, which would allow TPG to exercise control over Gemplus notwithstanding that it was purchasing only approximately 26% of its shares.

**C.    TPG's Acquisition of Gemplus Shares and the Shareholders' Agreement**

25.     In February 2000, TPG invested approximately $550 million into Zenzus (the Gibraltar-domiciled affiliate of Gemplus formed at TPG's direction), which, through a complex series of swaps, gave TPG (and its affiliates named as Defendants herein) a 26.4% ownership share of Gemplus and three seats on its Board of Directors. At this time, the Quandt family maintained a 19% interest in Gemplus, while Lassus held 16.3% of its shares.

26.     At the same time it invested, TPG, through Abel Halpern acting on behalf of TPG Giant LLC, TPG Partners III, L.P. and T3 Partners, L.P., entered into a Shareholders' Agreement (the "Shareholders' Agreement") with the Quandt family and Lassus dated as of February 18, 2000. The Shareholders' Agreement restricted the voting rights of greater than fifty percent of the shares of Gemplus, including those shares owned by Marc Lassus.

27.     The Shareholders' Agreement granted TPG considerable control over the management and control of Gemplus. In a March 24, 2000 letter to "Friends of TPG," a copy of

which was recently obtained by Plaintiffs, Halpern, Dechet and another TPG employee indicated that "[t]he combination of TPG's shareholders agreement and representation on the Board of Directors and Executive Committee *will allow TPG to exert significant negative control*. Similarly, through a series of agreements with other shareholders, the Founders[*i.e.*, Lassus]/Quandts/TPG shareholder group *will be able to effectively have positive control over the Company*." (Emphasis added.) Later in this letter, TPG indicated that "TPG will play a major role in the strategic development and positioning of Gemplus."

28.     The Shareholders' Agreement expressly allowed TPG, the Quandt family and Marc Lassus to each appoint three of the Board's ten directors. Thereafter, as discussed below, TPG maneuvered to control and appoint the Quandt seats as well, thus assuring that control of the Board would be in the hands of TPG.

29.     According to its terms, the Shareholders' Agreement was "strictly confidential," and, upon information and belief, representatives of TPG including Abel Halpern and Allan Green warned Marc Lassus on several occasions that he was not to mention it to the outside world.

30.     By its terms, the Shareholders' Agreement was to terminate "with respect to all parties, on the tenth anniversary of this Agreement", *i.e.*, on or around February 2010. The parties to the Shareholder's Agreement acknowledged in the Agreement that "following the IPO they shall be deemed to be acting in concert for purposes of applicable French Law and stock exchange regulations."

31.     The Shareholders' Agreement also required Lassus to give both TPG and the Quandt family "a written offer notice specifying the number of Shares to be sold, the identity of

the proposed purchaser, if known, and the purchase price per Share" prior to selling his shares during the period from February 18, 2000 through the Company's IPO, which is discussed below.

32.     The Shareholders' Agreement also permitted TPG to acquire as much as thirty-four percent of Gemplus's shares, and, in an April 3, 2000 correspondence to Lassus and Stephan Quandt, Abel Halpern indicated his "hope to subscribe to additional shares of Gemplus . . . ."

33.     The Shareholders' Agreement required Gemplus to provide Lassus with a compensation package that was substantially equivalent to any compensation offered to the CEO of Gemplus.  This clause would later become quite important because it required Gemplus to offer Lassus the same ill-considered loans that TPG directed Gemplus to offer to Antonio Perez, whom TPG appointed to serve as CEO for Gemplus.

**D.     TPG Enters into a Conflict of Interest Transaction**

34.     Upon information and belief, in late 1999, TPG, acting through Andrew Dechet, directed Gemplus to purchase Oldenbourg Daten System ("ODS"), an eastern German manufacturer of phone and bank cards.  On several prior occasions, Gemplus had decided not to acquire ODS and Gemplus's managers were against the acquisition.  Nonetheless, at Dechet's insistence, Gemplus purchased ODS for €21.7 million in or around April 2000 notwithstanding the objections of Gemplus's senior management.  The acquisition was a poor investment. Roughly one year after the purchase, Gemplus shut down ODS's production facility.  In its financial statements for the year end 2001, Gemplus wrote off €8,138,000 for its investment in ODS.

35.     The seller of ODS was Landis & Gyr Communications AG ("L&G"), a now bankrupt Swiss telecommunications-equipment maker.  At the time of the purchase, TPG held a 95 percent ownership interest of L&G, which, upon information and belief, it failed to disclose to Gemplus management or the Gemplus Board prior to insisting that the acquisition be made.

36.     TPG's control of ODS was not disclosed, either in the Registration Statement or prospectus for the Gemplus IPO, discussed below, or in financial statements for the year ending December 31, 2000, which were filed with the U.S. Securities and Exchange Commission ("S.E.C.") and with the C.O.B., the French securities regulation authorities, on or about June 29, 2001.  According to a September 29, 2005 report by the A.M.F., the failure to disclose TPG's controlling interest in ODS caused Gemplus to be in violation of the relevant accounting rule (IAS 24) and deprived the investing public of material information.

**E.     TPG Increases Its Control Over Gemplus**

37.     After completion of TPG's investment in February 2000, TPG increased its presence at Gemplus headquarters and its control over the management of the Company.  The point person for implementing TPG's decisions was Andrew Dechet, a principal at TPG.  Another TPG employee who was assigned to Gemplus but who, on information and belief, was never authorized by the Board to hold a senior management position was Helen Chen.

38.     Abel Halpern, a TPG managing director who eventually sat on Gemplus's board, also began playing a role in Gemplus's day-to-day affairs, making numerous visits to Gemplus's headquarters and exercising control over Gemplus's business decisions and strategy.   For instance, in June 2000, as discussed below, he ordered the payment of $400,000 to Bain Consulting despite the fact that Bain did not provide services during that month.  Halpern also ran the fall, 2000 meeting of the Gemplus Board of Directors in Singapore.  During this meeting Halpern disregarded presentations made by Gemplus management, and instead ordered these managers to create strategies which reflected TPG's business plan for Gemplus.

39.     In or around April 2000, TPG attempted to reduce the Quandt family's involvement in Gemplus.  Specifically, on or around April 18, 2000, Abel Halpern of TPG asserted in a letter to Stefan Quandt and Marc Lassus that the Quandt family's investment in

another technology company raised a possible conflict of interest between the Quandt family and TPG.

40.     Upon information and belief, Stephan Quandt and two other Quandt-appointed directors resigned from the board of Gemplus in 2000 as a result of this alleged conflict.  As discussed herein, TPG's eagerness to identify conflicts of interest for other parties did not extend to its own conduct, which was beset by undisclosed conflicts.

41.     After the Quandt directors resigned from the Board, upon information and belief, the Quandt family divested itself of any independent decision-making responsibilities with respect to Gemplus.  Upon information and belief, TPG thereafter appointed two new directors in addition to the three seats it already controlled, and reduced the size of the Board to eight seats, thereby ensuring that it controlled at least five of the eight seats on the Gemplus Board.

**F.     The Retention of Bain Consulting**

42.     As an example of the secret control exercised by TPG, TPG imposed on Gemplus's management and Board the retention of Bain Consulting, a consulting company with deep ties to TPG.  TPG's Halpern and William S. Price III, who would later join the Gemplus Board, had previously worked at Bain.

43.     In or around June 2000, upon information and belief, Bain Consulting submitted a $474,000 invoice to Gemplus for services rendered in June 2000 even though it only began working for Gemplus on June 28, 2000.  As late as June 29, 2000, Bain was submitting to Helen Chen revised proposals for services yet to be performed.

44.     Helen Chen and Andrew Dechet of TPG had been instrumental in the retention of Bain Consulting.  Nonetheless, based on various e-mail correspondence authored by both of them, it appears that as late as July 5, 2000, they were not even certain as to the scope, manner and kind of work that Bain would perform for Gemplus.

45.     Because Bain had failed to render services in June 2000, Gemplus's senior management refused to pay Bain for any additional invoices unless Gemplus was released from the June 2000 invoice.  Nonetheless, TPG – and in particular, Abel Halpern – interceded and directed Gemplus to pay this invoice over opposition from Gemplus's senior management, and, upon information and belief, such payment was made.

46.     It appears that TPG's intent in foisting Bain on Gemplus was to promote TPG's own future ties with Bain.  In an e-mail message Halpern indicated to Gemplus CEO Antonio Perez a concern that if the June payment were not made, certain Bain partners would "take a big hit in their year end comp" and that "they will not feel so warm and fuzzy about helping us out in the future."  Halpern then concluded that:  "As we do acquisitions, need to communicate complex messges [sic] to the public markets, and deal with financing activities in the future, these guys are very useful to have around."  Finally, he instructed Perez to "intervene here and help resolve the situation."  Upon information and belief, Halpern was not even a Gemplus employee at the time.

## G.     TPG Directs Perez's Appointment as CEO and His Compensation

47.     In or about July 2000, TPG personnel took over Gemplus's search for a new chief executive officer, after Marc Lassus was asked to give up the position (although he remained Chairman of the Gemplus Board of Directors until December 2001).  Upon information and belief, TPG employees Halpern and Price demanded that Gemplus use the services of an executive recruiting firm, Heidrich & Struggles, Inc., located in California, despite the fact that the search was for a CEO of a company headquartered in France.  Upon further information and belief, TPG did not involve Gemplus employees, or its Chairman Lassus, in this important task.  Rather, Halpern and Price conducted the search and were present for the interviews of candidates.  Upon information and belief, TPG selected Antonio Perez to be the new CEO of

Gemplus following interviews in California and hired him without input from any Gemplus employees or senior executives despite the fact that Perez did not even speak French.

48.    Upon information and belief, no employee of Gemplus was involved in negotiating the employment agreement between Gemplus and Perez.  The financial package offered to him was devised by TPG in consultation with Heidrich & Struggles.  As part of the Perez employment agreement, which was drafted by TPG's counsel in New York, Cleary Gottlieb, Gemplus was directed to offer Perez an enormously lucrative compensation package.  Perez's employment contract, signed on July 12, 2000 and amended on September 1, 2000 provided, in addition to salary and other benefits, for Perez to receive 10,247,893 Gemplus free shares and 20,495,786 stock options at the exercise price of €3.506.  Furthermore, the agreement required Gemplus (or its wholly-owned subsidiary, Zenzus) to make loans to Perez to enable him to exercise the options and purchase the shares, as well as for the payment of the taxes associated with the exercise of the options.  These loans amounted to more than €72 million.  The enormity of this compensation package was such as to enable Perez to acquire as much as 4% of the company's entire capital.  Still further, the loans were supposed to be secured by a pledge of the shares as collateral.  A pledge agreement dated July 26, 2000 was drafted but Gemplus, under TPG's control, failed to require Perez to sign the pledge agreement until as late as October 20, 2001.

49.    Perez's failure to comply with the terms of the loan and pledge agreement exposed Gemplus to the full value of the loans, as Gemplus later conceded in the investigation by the A.M.F.  Upon information and belief, at the time of the Gemplus IPO, discussed below, Gemplus's General Counsel, Stephen Juge, as well as TPG's Halpern and others, knew that Perez had failed to comply with the terms of his loan agreement.  Because the Perez pledge agreement

had not been signed at the time of the IPO, there was no binding agreement requiring Perez to collateralize or pledge the shares.

50.     Upon his termination as CEO in 2001, Perez returned his shares to Gemplus, but doing so did not fully reimburse the loans he had undertaken.  Rather, Gemplus's stock had dropped in value from the time Perez exercised his stock options in mid 2000, which meant that the returned shares did not cover the full amount of the loans.  Upon information and belief, Perez returned the shares as a condition of the Company forgiving the loans.  The unpaid portion of the loans was written off as a loss in Gemplus's financial statements.  The total cost incurred by Gemplus in connection with Perez's termination amounted to approximately €14.5 million, including the write-off of the debt.

**H.     TPG Directs Loans to Lassus**

51.     In accordance with the secret Shareholders' Agreement, Lassus was entitled to receive the equivalent shares and stock options as was granted to Perez.  Accordingly, TPG, through Dechet, also directed Gemplus to provide loans worth more than €72 million to Marc Lassus so he too could acquire shares equaling four percent of the Company's capital.  Gemplus, however, failed to properly document these loans, and Lassus was never asked to sign a pledge agreement regarding the loans.  Gemplus's failure to collateralize these loans exposed Gemplus to €72 million in potential loses.

52.     In its recent report, the A.M.F. found that Gemplus's disclosure of the Perez and Lassus loans was false and misleading in several respects, including that Gemplus failed to disclose that it was exposed with respect to the potential €72 million unsecured obligation from Lassus.  Moreover, as noted above, the loan to Perez was described as being secured when in fact the pledge agreement was not executed by Perez until October 20, 2001, almost 11 months after the IPO.  The A.M.F. report specifically found the disclosures about these loans in the IPO

prospectus, the Gemplus 2000 annual report filed with the C.O.B. and S.E.C. on June 29, 2001, a press release dated December 26, 2001, and in the Gemplus 2001 annual report filed with the C.O.B. and S.E.C. in July 2002, was materially false and misleading. The A.M.F. report described these false disclosures as being "extremely serious" and further noted that the nature of this false disclosure was such that it gravely deceived the general public with regard to the Company's financial condition, particularly considering that the loans represented at least 8% of the capital of Gemplus.

## I.   Enigma Purchases Gemplus Stock

53.   In late 1999, Enigma approached Marc Lassus and indicated its interest in investing in Gemplus stock. Enigma was impressed with Lassus and had enormous respect for him as an innovator and an entrepreneur who could invent and market technology successfully.

54.   During conversations in late 1999, Lassus told Enigma that it would "make a lot of money" in Gemplus. Nonetheless, Lassus did not disclose his discussions with TPG, the fact that he had already agreed to the Shareholders' Agreement with TPG and the Quandt family, or TPG's *de facto* control over the management and operations of Gemplus, including its decision to remove Lassus as CEO and take over the search for a new CEO who would be beholden to TPG. Upon information and belief, the reason that Lassus did not reveal these things to Enigma was that he was specifically instructed by TPG and its agents including Halpern, Dechet, and Green, not to make such disclosures to any third party, including Enigma. Had Enigma known of the Shareholders' Agreement, or of TPG's *de facto* control over Gemplus, it would not have purchased any Gemplus stock.

55.   During the early summer of 2000, Enigma spoke again to Lassus and discussed its desire to make an investment in Gemplus. In response, Lassus told Enigma to contact Allan Green, who would broker the transaction.

56.     Upon information and belief, during the time period relevant to this lawsuit, Allan Green received more than €20 million in fees for brokering TPG's investment in Gemplus.  At various times prior to the IPO and as late as March 1, 2000, Allan Green served on the Gemplus Board.  He also acted as advisor to David Bonderman, and, as such, was TPG's agent with respect to the Enigma Purchases.

57.     Allan Green negotiated the sale of Gemplus shares to Enigma.  In conversations with Enigma representatives, Green intentionally did not disclose the following material facts which he and TPG knew:  (i) a Shareholders' Agreement existed; (ii) TPG already controlled and managed Gemplus; (iii) TPG planned to continue to exercise control over Gemplus and to, in effect, take over the management of the Company, including transferring important Gemplus operations and management to the United States, (iv) TPG planned to marginalize the role of Marc Lassus, and (v) Gemplus had made over €144 million in loans to Perez and Lassus that were not properly secured.  Upon information and belief, Green was specifically instructed by TPG employees, including Abel Halpern, not to disclose these facts.  Upon further information and belief, Green was due to earn millions of dollars of commissions from brokering TPG's investment and, therefore, followed TPG's instructions.

58.     On July 14, 2000, Enigma purchased 3.5 million Gemplus shares from Centro Internationale Handelsbank ("Centrobank") for €19,208,576.  It is presently unknown to Plaintiffs how Centrobank came into possession of these shares.

59.     Lassus's association with Gemplus was a primary reason Enigma invested in Gemplus.  Had Enigma known any of the facts listed above that were withheld from it, Enigma would not have purchased the shares of Gemplus.  As is alleged further below, as a result of the

control secretly exercised by TPG and Bonderman, the shares acquired by Enigma declined in value and Enigma has been damaged thereby.

60.     On November 13, 2000, Enigma purchased an additional 308,000 Gemplus shares from Centrobank at a cost of €1,999,967.  (Enigma's July 14, 2000 and November 13, 2000 purchases are collectively referred to as the "Enigma Purchases".)

61.     Allan Green brokered this transaction as well.

62.     As with the initial stock purchase, Enigma did not know, at the time of the purchase, that:  (i) a Shareholders' Agreement existed; (ii) TPG in fact controlled and managed Gemplus; (iii) TPG planned to continue to exercise control over Gemplus and to, in effect, take over the management of the Company, including transferring important Gemplus operations and management to the United States, (iv) TPG planned to marginalize the role of Marc Lassus, and (v) Gemplus had made over €144 million in loans to Perez and Lassus that were not properly secured.  As with the initial stock purchase, upon information and belief, TPG and its agents took active steps to conceal their control over Gemplus and the existence of both the Shareholders' Agreement and the loans from Enigma, including by directing Lassus and Green not to disclose it or its effect to any purchasers of shares.

63.     By the time of this purchase, TPG, as a controlling shareholder of Gemplus, owed a duty to disclose these facts to Plaintiff Enigma.  Had Enigma known any of these facts, it would not have entered into this share purchase transaction.  Furthermore, TPG's exercise of control has resulted in a decrease in the value of Enigma's shares.

**J.      TPG Directs Gemplus to File a Misleading Registration Statement**

64.     On or around November 20, 2000, Gemplus filed its Registration Statement with the S.E.C. on Form F-1 to register an initial public offering of common shares and American Depositary Shares (ADSs), amended and refiled with the S.E.C. as Amendment No. 3 on

December 11, 2000. As set forth therein, the offering included approximately 71.8 million shares, 15 million of which were new shares to be offered by the Company with the remainder being shares offered by certain selling shareholders. The U.S portion of the offering was 14,500,000 new shares (in the form of ordinary shares or ADSs). Each ADS represents two shares. Gemplus also filed corresponding offering documents with the French securities authorities, including a prospectus.

65. At the time of the IPO, the Company had eight Board members, five of whom were under TPG's control. Three of the directors (Halpern, Price and Dechet) were TPG managing partners. Two other directors, Randy L. Christofferson and Lee Kheng Nam, also were beholden to TPG and served at TPG's pleasure.

66. Upon information and belief, TPG's managing directors, including Bonderman, Dechet, and Halpern, directed the drafting of the Registration Statement, together with TPG's attorneys at Cleary Gottlieb in its New York office. Upon information and belief, although it may have technically been acting as issuer's counsel, Cleary Gottlieb reported primarily to TPG's executives.

67. The Registration Statement that Gemplus ultimately issued contained numerous material omissions and misrepresentations. Specifically, the Registration Statement failed to disclose or materially misprepresented:

     a. The existence and effect of the Shareholders' Agreement;

     b. The substantial control that TPG was exercising over all aspects of Gemplus's business, including its management, business strategy, personnel and governance;

c.   The fact that the Shareholders' Agreement governed the operation of Gemplus subsequent to the IPO;

d.   The fact that the Shareholders' Agreement directed Gemplus to pay Marc Lassus up to $15 million in termination fees, even though Gemplus was not a party to this agreement;

e.   The fact that TPG had directed Gemplus to purchase ODS over the objections of Gemplus's managers and that TPG held a 95 percent ownership interest in ODS;

f.   The fact that Gemplus's treasury holdings were held by an indirect subsidiary of Gemplus located in Gibraltar as a result of a tax avoidance scheme directed by TPG;

g.   The fact that TPG intended to terminate Marc Lassus as chairman of Gemplus's board and to isolate him from Gemplus's management;

h.   The fact that the €72 million loan that Gemplus had made at TPG's insistence to Antonio Perez was not properly documented and was not secured by the pledge of Gemplus shares as collateral, and therefore subjected Gemplus to a significant risk of nonpayment;

i.   The fact that the €72 million loan that Gemplus had made at TPG's insistence to Marc Lassus was not properly documented and was not secured by the pledge of Gemplus shares as collateral, and therefore subjected Gemplus to a significant risk of nonpayment;

j.      The fact that accounting rules required a substantial reserve to be taken in consideration of the risk that the Perez and Lassus loans might not be repaid; and

k.      The fact that TPG planned to make major reductions in the number of employees and to move significant operations out of France, thereby raising the risk of an adverse relationship with the French labor unions;

68.     The Registration Statement was signed by TPG's representatives who sat on Gemplus's Board, William Price, Abel Halpern, Andrew Dechet, and Randy Christofferson, as well as Marc Lassus.

69.     On December 7, 2000, Gemplus began offering its shares to the public.

70.     A prospectus was also filed in France in connection with the IPO. Although this statement did make passing reference to the existence of a shareholders' agreement, it gave no indication of the meaning, effect, content or scope of the agreement.

71.     The French prospectus was false and misleading in that it did not indicate that TPG had, in fact, already exercised control over the operations and management of Gemplus. On the contrary, it stated that:  "No person (individual or entity) controls the Company."  This statement was false when made.  In addition, the French prospectus was false and misleading for the same reasons set forth above in paragraph 67(a) through (k).

**K.      Ebun's Purchases and Sales of Gemplus Stock**

72.     On December 13, 2000, Ebun purchased 200,000 Gemplus shares at €6.00 per share.

73.     On January 3, 2001, Ebun purchased 10,000 Gemplus ADSs at $16.78 per share, and 10,000 ADSs at $16.30 per share.

74.     On February 2, 2001, Ebun sold 10,000 Gemplus shares at €8.65 per share, and 10,000 Gemplus shares at €8.69 per share.

75.     On February 5, 2001, Ebun sold 6,206 Gemplus shares at €8.70 per share.

76.     On February 16, 2001, Ebun sold 20,000 Gemplus shares at €8.51 per share.

77.     On April 6, 2001, Ebun purchased 20,000 Gemplus shares at €3.97 per share; and sold 110,000 shares at €3.94 per share.

78.     On April 9, 2001, Ebun purchased 700,000 Gemplus shares at €4.00 per share.

79.     On April 9, 2001, Ebun sold 333,482 Gemplus shares at €3.72 per share.

80.     On May 2, 2001, Ebun sold 100,000 Gemplus shares at €4.26 per share, and 100,000 shares at €4.29 per share.

81.     On May 3, 2001, Ebun purchased the following Gemplus shares: 50,000 at €4.62 per share; 50,000 at €4.68 per share; 50,000 at €4.73 per share; 100,000 at €4.82 per share; and 190,000 at €4.68 per share.  On May 3, 2001, Ebun also sold 100,000 Gemplus shares at €4.23 per share.

82.     On May 7, 2001, Ebun purchased 110,000 Gemplus shares at €4.52 per share, and 150,000 shares at €4.75 per share.  (All of Ebun's purchases are collectively referred to as the "Ebun Purchases").

**L.      TPGs Management Team Clashes with Gemplus Employees**

83.     Although the December 2000 Registration Statement never disclosed that TPG was in control of the management of Gemplus and intended to run Gemplus after the IPO, TPG's senior executives, including David Bonderman, played a significant personal role in the management of Gemplus after the IPO was concluded.  In addition to constituting a fraud on Plaintiffs and the other shareholders who invested in Gemplus without knowing that TPG was going to be controlling the Company, the manner in which TPG exercised its control also

constituted a breach of its fiduciary duty to Gemplus and its shareholders, including Plaintiffs, and caused economic harm to the Company and the shareholders. Much of this harm was caused by the fact that TPG failed to recognize that the management team it installed at Gemplus clashed severely with Gemplus's veteran management and directors and destabilized the Company.

84.     In particular, Gemplus's newly installed CEO, Perez, and its Chairman, Lassus, grew disenchanted with one another over Gemplus's business strategy, which included a shifting of management to the United States and a dramatic reduction of the labor force residing in France, including the termination of roughly 1000 jobs. Lassus and Gemplus management also viewed Dechet, the TPG principal who functioned as the CEO on the ground in France since Perez, based in the United States, was rarely there, as unwilling to learn about Gemplus's business or to consult with Gemplus's veteran management over important business decisions. To make matters worse, Dechet was on the Gemplus Board but was not listed in the December 2000 Registration Statement as having a management position.

85.     TPG was advised of the discord in the Company at least by April 9, 2001, when Allan Green informed TPG's Abel Halpern that Gemplus employees viewed Dechet and the other TPG installed management as arrogant, distrustful of Gemplus's employees, and unable to understand Gemplus's business and strategy. In a memorandum, Green warned Halpern as follows: "I don't mean to say that we must remove the head but some visible move must be done very soon and this is not a business school exercise where you send them a questionnaire and give them weeks to answer. Competition is aware of the moral of our troops and they are going to attack us very strongly and hurt us. Let's talk during the day and agree on an imminent move." He suggested that TPG consider removing Dechet.

86.    On April 9, 2001, Lassus sent a detailed report to TPG's Abel Halpern and William Price, both of whom were on the Gemplus Board, discussing various critical issues for Gemplus.   This report was highly critical of Perez and of TPG's management team and specifically advised TPG that Perez's management team had made communications to the press regarding its profit warnings "of an extremely poor quality" and that these communications failed to integrate "the form and spirit of what we have been discussed [sic] at length . . . "

87.    On or around June 30, 2001, Bonderman met with Perez and Lassus in Aspen, Colorado to develop a number of business strategies for Gemplus, which were memorialized in a memorandum that Bonderman prepared.   Despite Bonderman's involvement, Perez and Lassus clashed bitterly over business strategy for Gemplus, as described below.   Bonderman also began to attend Gemplus board meetings and to involve himself in management decisions.

88.    Lassus was not the only one to raise concerns.   Gemplus employees also registered concern when Perez blamed the economy for Gemplus's poor performance while at the same time orchestrating numerous cuts in the Company's research and development wing as well as its unit devoted to marketing new products.   These employees ultimately brought suit against the Company.

89.    In October 2001, Lassus wrote a report to David Bonderman indicating that "sales and financial results are catastrophic."   He added that the "management pretended that the market situation degraded during the last 3 weeks.   This is untrue."   Lassus also indicated that TPG's management team was "destroying Gemplus's unique industry technology basket and that it was arrogant and distrusted by Gemplus's employees."   In this same report, Lassus described a catalog of problems that the Company faced, including an unwieldy structure, loss of market share, a failure to capitalize on Gemplus's technological competitive advantage, a failure to

approach key purchasing markets, and the enormous expense of moving Gemplus's headquarters to California. Lassus indicated that the management team installed by TPG was responsible for these failures. Bonderman responded to this correspondence indicating that a TPG team would review the situation to "make sure we are on the right track . . . ."

90.     During this time period, Lassus again took issue with the TPG management's decision to move operations from France to California at great expense to Gemplus. Nonetheless, Lassus's concerns appear to have been ignored by the TPG-appointed management. Several weeks later, on November 23, 2001, Lassus wrote to Bonderman indicating that "if you, David, were in my position you would not tolerate being considered a non-person or a non-shareholder, as Perez and your people do me, all the time." Lassus also noted that "TPG behaves as if it is the controlling shareholder of the Company."

91.     TPG maintained control over other facets of Gemplus as well, including the management of employment searches for important executive positions, including its CEO and CFO. TPG, and in particular Bonderman and Dechet, insisted that Gemplus retain particular executive search firms with which TPG had prior relationships notwithstanding the objection of senior Gemplus management that the firms in question were not best qualified to conduct the searches and required unduly excessive fees.

92.     Another example of TPG's domination over Gemplus occurred on or about December 19, 2001, when TPG convened a Gemplus board meeting at the Landsdowne Conference Center located in Virginia. Claudine Goyat of TPG faxed the agenda to Marc Lassus on TPG letterhead, thereby demonstrating TPG's unusual role in running the affairs of Gemplus. At this meeting, which was run by Bonderman, TPG forced Lassus to resign as Chairman and Perez as CEO. TPG also instructed that Ron Mackintosh, the president of Differentis, a

company in which TPG owned a major stake, be named as the interim CEO of Gemplus.  As part of his termination, Gemplus agreed to pay Lassus a termination fee of $12 million, i.e., the fee that TPG had agreed to pay Lassus in accordance with the Shareholders' Agreement, with $10 million conditioned upon Lassus returning the shares he had acquired with Gemplus's €72 million loan.

93.     Upon information and belief, TPG permitted Lassus to remain as a non-executive director of Gemplus until TPG called a shareholders meeting in or around November 2002, at which Lassus was dismissed from the Board.

94.     TPG used its counsel, Cleary Gottlieb, and in particular, attorneys from its Washington, D.C. office, to draft the various agreements arising out of the December 19, 2001 Board meeting, including the settlement agreement.

95.     Yet another example of TPG's dominance over Gemplus took place over the next few months, as David Bonderman began supervising the process of appointing a permanent CEO to replace Perez despite the fact that the shareholders had not yet elected Bonderman to the Board and the Board had not authorized his appointment as an officer of Gemplus.  As part of this process, TPG directed Gemplus to engage a U.S.-based recruiting firm to conduct the search.

**M.     TPG Directs Gemplus Management to Enter into the Differentis Transaction**

96.     Another manifestation of TPG's exercise of control over Gemplus was that TPG's employees directed Gemplus to enter into a service contract with Differentis, a newly-formed, London-based management consulting firm, which was supposedly created to improve the performance of technology companies.  Upon information and belief, Gemplus's managers, including its then Chairman, Marc Lassus, were opposed to the contract.  However, TPG insisted that Gemplus contract with Differentis and on or around October 31, 2001, Gemplus signed a consulting contract with Differentis.

97.    Upon information and belief, at the time they were promoting the Differentis transaction, Gemplus's TPG appointed management team did not disclose to the Gemplus Board that TPG held an approximately 45 percent investment stake in Differentis as TPG had invested $15 million in Differentis in or around September 25, 2000.   Upon information and belief, Mackintosh and TPG's representatives on the Gemplus Board, specifically at least Halpern, Price, Christofferson and Dechet, were well aware of the conflict of interest that this transaction posed.   Furthermore, Differentis's former CEO, Ron Mackintosh, who would later be appointed to replace Perez as the interim CEO of Gemplus, sat on the Boards of both Differentis and Gemplus.

98.    Although the minutes of the Gemplus Board meeting dated October 31, 2001 at which the transaction was approved reflect that Mackintosh and the TPG Board members disclosed their interest and abstained from the vote, the minutes were not approved until a year later.   On October 29, 2002, a new, TPG-dominated Gemplus Board, including Bonderman, approved the minutes, with Lassus and another independent director, Ziad Takieddine, voting against them.   Upon information and belief, in an egregious act of corporate malfeasance, TPG's representatives ordered the Gemplus's Board minutes for the October 31, 2001 meeting to be rewritten to reflect a level of disclosure regarding the Differentis transaction that never actually occurred.   In fact, upon information and belief, the TPG board members did not disclose that they and TPG has a significant stake in Differentis when the consulting contract was awarded to Differentis.

99.    As Differentis was a "start-up" company, the Gemplus contract constituted a substantial portion of Differentis's revenues.   Upon information and belief, Differentis ultimately

received approximately €3 million in compensation from Gemplus notwithstanding that the services provided by Differentis provided little value.

100.    Furthermore, the A.M.F. investigation, discussed further below, concluded that Gemplus violated applicable accounting rules when it failed to disclose, in its annual report and financial statements for the year ending December 31, 2001, filed on or about July 8, 2002, that TPG had an ownership interest in Differentis.

101.    Upon information and belief, by November 2001, TPG employees were in total control of Gemplus's budgeting process and disclosure of financial information.  For instance, in late 2001, Andrew Dechet proposed a meeting of Gemplus's high level executives to deal with budget, restructuring, and communications issues.  Dechet signed the letter proposing this meeting in his capacity as a partner of Texas Pacific Group.  During the course of the meeting, Dechet objected to the budget process and ordered everyone to meet the next morning at 7:00 a.m.  He flew in three people from TPG's London office overnight to work with the Gemplus managers.  Each manager worked with one of the three TPG London representatives to create a new budget.  In addition to the budget process, Gemplus was unable to release its quarterly numbers and results without TPG's involvement and approval.

102.    While under the control of TPG, during the period from 1999 through 2002, Gemplus had at least three different chairmen of the Board of Directors and a series of CEOs (Perez, Mackintosh and Mandl), numerous high level executive and administrative defections, a significant loss in its market share, and a body of employees and managers who were openly hostile to TPG and its management team and sometimes ended up suing them.

103.    The instability that resulted from TPG's domination of Gemplus damaged the Company and reduced the value of its shares.  During the period from the December 2000 IPO

through December 31, 2001, Gemplus's stock price declined from €7.50 per share to €2.84 per share and its ADSs quoted on NASDAQ declined from $13.38 to $5.23.

104.    TPG's undisclosed control over Gemplus had a significant impact on U.S. based investors.  In the fall of 2001, six out of the ten institutional investors that held more than 1 million Gemplus shares traded on the French market were U.S. based and held their shares through European or World funds.

**N.     Under TPG's Control, Gemplus's Financial Disclosures Were False and Misleading**

105.    In addition to the misrepresentations and omissions in the Registration Statement and the periodic reports discussed above, Gemplus, under the control of TPG, issued a series of materially false and misleading press releases, which were publicly filed with the C.O.B. and with the S.E.C. from 2000 through 2002.  In a report dated September 29, 2005 and reported in the French press, the General Director of the A.M.F. concluded that Gemplus failed to keep the public properly informed with respect to, among other things, (i) the Company's earnings and earnings prospects, (ii) the €72 million in loans each to Perez and Lassus discussed above, and (iii) the financial interests of TPG in Differentis and ODS, discussed above.

106.    With respect to disclosures concerning Gemplus's earnings and earnings prospects, the Company was found to have made material misrepresentations and omissions in numerous press releases issued in 2001 and 2002, and filed with the S.E.C. and C.O.B., with respect to its expected revenues and earnings.   The A.M.F. report found that these misrepresentations and omissions misled the market.   Furthermore, the A.M.F. found the Company's disclosures concerning the reasons why forecasts were incorrect on several occasions to be inconsistent and therefore misleading as to the true causes for the reversals in the Company's business.

107.    In a press release dated August 1, 2001, Gemplus forecasted "third quarter revenue to grow 7% sequentially with operating losses of about 13-18 million Euros . . . . [and] with operating profit, before restructuring, at about 5 million Euros."  As the A.M.F. found, this statement was materially and knowingly false because various correspondence sent by Mr. Lassus, starting in April 2001, to TPG's Bonderman and Halpern, as well as to Stephan Juge, the in-house counsel for Gemplus, presented a negative analysis of the company's situation that was not reflected in any Gemplus press release prior to the one issued on September 27, 2001 (described below), which announced a profit warning.

108.    This unduly positive analysis was repeated in a September 6, 2001 news article in Paris's *La Tribune*.  In the article, a statement attributed to the chairman and chief executive officer of Gemplus was quoted as follows: "GEMPLUS management is committed to transparency" and "the situation is sorting itself out, but we are not changing our forecast." These statements were determined to be false and based on information known to Gemplus and TPG principals' Bonderman and Halpern.

109.    Several weeks later, and just before the quarter closed, on September 27, 2001, the Company issued a press release finally altering its third-quarter forecast and projecting an operating loss of 30 to 37 million euros for the third quarter of 2001.

110.    The September 27th press release blamed the weakening U.S. dollar as a major cause of the Company's downgraded forecast.  Indeed, Gemplus noted that "the effect of foreign-exchange transactions could have a negative effect on operating earnings by almost €8 million. This amount reflects a reduction in operating earnings by approximately 40%."  Nonetheless, Gemplus failed to address the foreign exchange effect when it announced its third quarter earnings on November 6, 2001.  This failure to adequately inform investors of the impact of

foreign-exchange transactions on the Company's performance, particularly in light of its earlier disclosure, was a material omission.  As the A.M.F. noted, the fact that a 40% reduction in operating earnings can occur as a result of a simple foreign-exchange effect is an important, and even critical, piece of information for an investor who is deciding whether to buy or sell. Gemplus itself recognized the materiality of this information when it attributed the foreign-exchange effect as a major cause of the operating loss in its profit warning on September 27.

111.     Gemplus's inadequate controls over financial reporting were known to its senior management and to TPG.  Because of his concern over inaccurate disclosures, Gemplus's head of investor relations, Jean-Michel Paul wrote to Lassus and Halpern in December 2001.  He reported "disturbing facts or malfunction about Gemplus Investment Relations program."  Paul also indicated that "it is now indeed quite clear in my mind that violations of S.E.C. regulations have taken place" and that he had faced retaliation for raising these concerns.  Ultimately, Paul was terminated from his position.

112.     Throughout 2002, Gemplus, at the direction of TPG, continued to misinform the investing public, including Plaintiffs.  In a statement filed with the C.O.B. on July 8, 2002, and an announcement in the *Les Echos* newspaper as published on July 4, 2002, Gemplus, under TPG's domination, forecasted a return to financial equilibrium during the third quarter and profitability by the fourth quarter of 2002.  The Company had reported net losses every quarter since the fourth quarter of 2001.  When the Company issued a press release reporting its financial results for the second quarter of 2002 on July 31, 2002, filed with the S.E.C. on Form 6-K on August 2, 2002, it disclosed that it was "[o]n track for profitability in Q4 2002."  The then CEO of the company, Ron Mackintosh, stated that "[t]hese results show good progress towards our immediate goal of restoring Gemplus to profitability.  We are reasonably confident

that we shall achieve this in the fourth quarter of this year. . . . There is much still to be done, we operate in an [sic] highly competitive marketplace and the economic environment is not helpful. Nevertheless, Gemplus can have pride in its operating achievements this year to date and confidence in its potential." The filing also stated the restructuring program that the company had announced earlier in the year would "deliver profitability in Q4 2002."

113.    These statements were false and misleading because, by that time Gemplus (and through its principals serving in senior positions at Gemplus, TPG) knew that the Company would not break even and would in fact report a loss in the third quarter, and that it would not be able to report a profit in the fourth quarter of 2002. Indeed, the A.M.F. investigation found that Gemplus's management had available to it a forecasting tool, which allowed its management to rapidly make projections and adjust its business strategy. By July 30, 2002, Gemplus management and TPG knew that the operating earnings (before restructuring charges) would show a loss of €12.2 million. Despite having knowledge of this critical information, the Company under the control of TPG did not revise its forecast until October 31, 2002. Only then, when the Company announced its third-quarter results and could no longer hide its actual financial condition did the Company correct the earlier forecast.

**O.    The April 17, 2002 Shareholders Meeting:
TPG and Bonderman Continue to Manipulate Gemplus's Affairs**

114.    On April 17, 2002, David Bonderman put himself up for election to the Board.

115.    Through various maneuvers, including the threat of adjournment, TPG increased the size of the Board, and appointed Bonderman as a thirteenth member of the Gemplus Board. Perhaps fearing that these maneuvers would be disapproved of, the TPG-controlled Board specifically denied a motion to invite a legal advisor to this Board meeting.

**P.      Shareholders Object to Gemplus and TPG's
         Improper Corporate Governance and Audit Review**

116.    Over the course of the next several months, Gemplus, under the control of TPG, refused to implement new corporate governance guidelines that had been proposed by certain shareholders and minimized the role of the Company's Audit Committee.

117.    TPG and, specifically, Bonderman, unilaterally hired Alex Mandl as the new CEO, notwithstanding the opposition of the compensation and hiring committee of Gemplus's Board.  Mandl was granted a lavish compensation package, which included $80,000 per month for operating expense payments for Mandl's home.  In reality, Mandl's home only required modest operating expenses, and, upon information and belief, the majority of these payments were directed to Mandl's equity interest in his property.

118.    Gemplus, under the control of TPG, also refused to provide shareholders with information about loans that Gemplus's French affiliate was intending to make to Gemplus's U.S. affiliate, which would never be repaid.  Shareholder requests for further information to address these concerns were categorically rejected by the Gemplus Board and/or its Audit Committee.

**Q.      Under TPG's Control, Gemplus Continues to Misrepresent the Loans**

119.    Gemplus's subsequent disclosures regarding Lassus's loans compounded the fraudulent statements appearing in the Registration Statement.  On December 26, 2001, Gemplus issued a press release disclosing the costs associated with the resignations of Perez and Lassus. The press release failed to mention a December 19, 2001 agreement by which the Company had finally secured a promise from Lassus to pledge his shares and formalize his loans.  In fact, the press release did nothing to correct the misrepresentations which had been made in the Registration Statement regarding his loans.  Indeed, as late as September 23, 2002, Gemplus's

Board discussed the inaccuracies in its disclosures relating to Lassus's loans and that the disclosures needed to be corrected.

120.   The A.M.F. recently determined that Gemplus failed to accurately report or account for the inadequate collateralization of the loans to Lassus and Perez, in Gemplus's annual statement for year end 2000 and in its press release on December 26, 2001.   The misrepresentations in the annual statement gave the false impression that Lassus and Perez had guaranteed the loans when they in fact had not.   The press release reinforced this false impression by failing to disclose the large amounts at stake, the absence of any agreement formalizing the loans to Lassus, and the absence of a pledge of the shares or any other collateral to secure the loans.   In addition, the A.M.F. concluded that there was a genuine risk of non-repayment on Lassus's loan by December 2001, which is when the Company should have posted a reserve for the loans.   The A.M.F. noted that had the reserve been timely made, it would have significantly increased the Company's reported losses and affected the price of its stock.

**R.**   **Gemplus Denies TPG's Control in the Luxembourg Proceeding**

121.   On or about October 8, 2002, a representative of Plaintiffs filed an action against TPG and the Quandt family in the Commission de Surveillance du Secteur Financier, an administrative agency in Luxembourg.   In this action, it was alleged that TPG and the Quandts were voting "in concert" to control Gemplus, actions which are improper under Luxembourg law without adequate disclosure.   Upon information and belief, in this proceeding, TPG and the Quandts denied the existence of any agreement wherein they agreed to act in concert, including the Shareholders' Agreement which they had entered into in February 2000.

122.   Upon information and belief, the tribunal in Luxembourg adopted TPG's and the Quandt family's position and concluded in a decision dated November 14, 2002 that there was no written shareholders' agreement between TPG and the Quandt family.

123.    TPG actively concealed its control over Gemplus by falsely asserting before the Luxembourg tribunal that there was no Shareholders' Agreement and that it was not acting in concert with other shareholders.   TPG's concealment of this fact resulted in the Luxembourg tribunal adopting their deceptive position in its decision dated November 14, 2002.  By reason of the foregoing, TPG fraudulently concealed its control over Gemplus from Plaintiffs.

## S.    Plaintiffs Discover TPG's Fraud

124.    In February 2003, in light of Gemplus' internal upheaval and its four profit warnings issued in 2001, the General Director of the A.M.F began an investigation into the financial information supplied by Gemplus since June 1, 2001, including its year-end 2000 financial statements.

125.    As discussed above, as a result of that inquiry, the A.M.F. found that Gemplus, under the control of TPG, had supplied inadequate and deceitful information in violation of French securities, company, and accounting laws and standards, and in doing so, had compromised the efficient operation of the market for Gemplus stock.  In addition, the A.M.F. found that TPG exerted a "significant degree of influence" over Gemplus.

126.    Plaintiffs became aware that TPG's earlier denial of control over Gemplus in the Luxembourg action was untrue when they learned about the preliminary findings of the A.M.F., in a report which was issued on or after July 9, 2004.  In that report, the A.M.F. determined that TPG controlled Gemplus.  Specifically, the A.M.F. noted the existence of the Shareholders' Agreement and the fact that it remained in force after the IPO.  The A.M.F. also noted that the Shareholders' Agreement had never been adequately disclosed by Gemplus in violation of French securities, company, and accounting laws and standards.

127.    In its final report dated September 29, 2005, the Sanctions Committee of the A.M.F. sustained numerous regulatory and statutory violations against Gemplus, Marc Lassus,

Ron Mackintosh, and the Company's independent auditors. As discussed above, the Committee found Gemplus in violation of the regulations concerning public disclosures. The Committee has proposed monetary sanctions against each of them.

## COUNT I

### VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5 PROMULGATED THEREUNDER

### (AS AGAINST TPG AND DAVID BONDERMAN)

128. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

129. Defendants TPG and Bonderman, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities, including Plaintiffs, in violation of § 10(b) of the Exchange Act and Rule 10b-5.

130. Defendants TPG and Bonderman, individually, in concert, and/or through their agents, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, carried out a plan, scheme and course of conduct, which was intended to, and did, deceive Plaintiffs and the investing public regarding Gemplus's business, operations, management and the intrinsic value of Gemplus's publicly traded shares, by instructing Lassus and Green to conceal material facts from Enigma, and by drafting and disseminating a false and misleading Registration Statement and prospectus.

131. Specifically, as alleged above, the Registration Statement and the prospectus failed to disclose or materially misrepresented:

    a.    The existence and effect of the Shareholders' Agreement;

b.      The substantial control that TPG was exercising over all aspects of Gemplus's business, including its management, business strategy, personnel and governance;

c.      The fact that the Shareholders' Agreement governed the operation of Gemplus subsequent to the IPO;

d.      The fact that the Shareholders' Agreement directed Gemplus to pay Marc Lassus up to $15 million in termination fees;

e.      The fact that TPG had directed Gemplus to purchase ODS over the objections of Gemplus's managers and that TPG held a 95 percent ownership interest in ODS;

f.      The fact that Gemplus's treasury holdings were held by an indirect subsidiary of Gemplus located in Gibraltar as a result of a tax avoidance scheme directed by TPG;

g.      The fact that TPG intended to terminate Marc Lassus as chairman of Gemplus's board and to isolate him from Gemplus's management;

h.      The fact that the €72 million loan that Gemplus had made at TPG's insistence to Antonio Perez was not properly documented and was not secured by the pledge of Gemplus shares as collateral, and therefore subjected Gemplus to a significant risk of nonpayment;

i.      The fact that the €72 million loan that Gemplus had made at TPG's insistence to Marc Lassus was not properly documented and was not secured by the pledge of Gemplus shares as collateral, and therefore subjected Gemplus to a significant risk of nonpayment;

j.      The fact that accounting rules required a substantial reserve to be taken in consideration of the risk that the Perez and Lassus loans might not be repaid; and

k.      The fact that TPG planned to make major reductions in the number of employees and to move significant operations out of France, thereby raising the risk of an adverse relationship with the French labor unions.

132.    The misrepresentations and omissions described above were material insofar as a reasonable investor would consider these misstated and omitted facts as significant in making a decision whether to invest in Gemplus stock and the omissions should have been disclosed in order to make the statements made not misleading.

A.      **Scienter Allegations**

133.    As alleged herein, Defendants TPG and Bonderman acted with scienter because they knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading, and knew or recklessly disregarded that such statements and documents would be issued or disseminated to Plaintiffs, their representatives and the investing public.

134.    As set forth elsewhere herein in detail, Defendants TPG and Bonderman, by virtue of their control over Gemplus's business, including the preparation of the IPO Registration Statement and prospectus, had actual knowledge of the facts regarding Gemplus, its business practices, and finances.  TPG, through Bonderman, Dechet, Halpern and others, were thus active and culpable participants in the fraudulent scheme alleged herein.  The fraudulent scheme described in this Amended Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of these individuals who are managing partners of TPG.

135.   As active managers in control of Gemplus, TPG knowingly or recklessly used Gemplus to conceal material information from Plaintiffs, their representatives, and the investing public in order to enhance the value of TPG's more than $500 million investment in Gemplus stock.  In fact, Gemplus's own head of investor relations, Jean-Michel Paul wrote to Halpern of TPG in December 2001 indicating "it is now indeed quite clear in my mind that violations of S.E.C. regulations have taken place."

136.   With respect to the fraudulent concealment of TPG's control over Gemplus both before and after the IPO, as alleged herein, TPG demanded that the Shareholders' Agreement include a confidentiality clause.  TPG representatives, including Abel Halpern, demanded that the parties to the Shareholders' Agreement comply with the clause before, during and after the IPO.

137.   Prior to the IPO, Bonderman and TPG did not want to disclose the fact that they dominated Gemplus to other investors, including Plaintiffs, because, upon information and belief, Bonderman and TPG were concerned that such a disclosure would "tip off" minority shareholders as to TPG's desire to acquire additional Gemplus stock, thereby allowing these minority shareholders to extract a "control premium" from TPG to the extent that TPG attempted to purchase more Gemplus shares, which it planned to do.

138.   TPG and its agents, including Bonderman, Dechet and Halpern, also participated in causing Gemplus to misrepresent the nature of the loans to Lassus and Perez because TPG knew that the accurate disclosure and accounting treatment of the loans in connection with the IPO would have lowered the Company's value, thereby decreasing the offering price for Gemplus stock.  Given the magnitude of the loans, which totaled over €144 million, and the likely impact a reserve for the loans would have on the Company's share price, TPG and

Gemplus continued to conceal the Company's failure to adequately secure the loans. Upon information and belief, at the time of the IPO, TPG and its agents, including Bonderman, Dechet, and Halpern, knew that Gemplus's loans to Lassus and Perez were not collateralized and/or pledged. In addition to having negotiated the loans, the Company's independent auditors told Gemplus management, which included TPG personnel, as early as September 2000 that the loans were not guaranteed or secured. Nonetheless, Gemplus and TPG ignored this advice and misrepresented the loans in the Registration Statement.

139. Upon information and belief, by the time of the public offering, Bonderman and TPG did not want to disclose TPG's domination of Gemplus to the public out of a concern that such information would cause the French stock market to react negatively, particularly if the market learned of Lassus's marginalized role in management and Gemplus's high profile standing as a leading French technology company. For these reasons, TPG and Bonderman (and at their direction, Gemplus) concealed the existence of the Shareholders' Agreement and the fact that TPG and Bonderman exercised *de facto* control over Gemplus.

**B.    Reliance Allegations**

140. Plaintiff Enigma was deceived by the material misrepresentations and omissions made in connection with its acquisition of Gemplus shares prior to the IPO. Had the Defendants not concealed, or directed others such as Green and Lassus to conceal, from Enigma the material information regarding TPG's domination of Gemplus, its plans to oust Lassus and take over the Company, the loans to Lassus and Perez, and its direction to Gemplus to acquire companies in which TPG had an undisclosed interest, Enigma would not have purchased or otherwise acquired Gemplus securities.

141. Plaintiff Ebun reviewed the prospectus and Registration Statement at the time of its purchases of Gemplus shares and ADSs. Ebun relied on the misrepresentations and omissions

therein when it purchased Gemplus common shares and Gemplus ADSs, which were repeated in the press releases and filings made by Gemplus through May 2001.

142.   Plaintiff Ebun also relied on the integrity of the market for Gemplus shares – a market that was artificially inflated by defendants' fraudulent statements and omissions.  With respect to the purchases made by Ebun during and after the IPO, the market for Gemplus securities was an efficient market for the following reasons, among others:

a.   Gemplus stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the *Premier Marché* of the Paris Stock Exchange, both highly efficient and automated markets.

b.   As a regulated issuer, Gemplus filed periodic public reports with the S.E.C and the A.M.F.

c.   Gemplus regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases and through other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services.

d.   Gemplus was followed by several securities analysts employed by major brokerage firms in both the U.S. and France who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

143.   As a result of the foregoing, the market for Gemplus securities promptly digested current information regarding Gemplus from all publicly-available sources and reflected such

information in Gemplus stock price.   Under these circumstances, a presumption of reliance applies.

144.    In addition, at the times Plaintiffs purchased Gemplus shares and ADSs, as a result of TPG's efforts to conceal certain information, Plaintiffs were without knowledge of the facts concerning the omissions alleged in this complaint.  Therefore, the presumption of reliance established by a material omission applies to Plaintiffs' purchases.

## C.    <u>Causation Allegations</u>

145.    As a direct and proximate result of TPG and Bonderman's wrongful conduct, Plaintiffs have suffered damages in connection with their respective purchases and sales of the Company's securities in amounts to be established at trial.

146.    By misrepresenting and omitting material information, including with respect to TPG's control, the effect of the loans, and TPG's plans for Gemplus, as detailed above, Plaintiffs were fraudulently induced to purchase shares and ADSs.

147.    Defendants' fraudulent scheme to misrepresent and omit material information from Plaintiffs, their representatives, and the investing public resulted in the artificial inflation of Gemplus's stock and ADS prices at the time of the Enigma Purchases and Ebun Purchases.

148.    The very facts that the Defendants concealed from Plaintiffs, i.e. the existence of the Shareholders' Agreement and TPG's control over Gemplus, once executed, caused significant instability at Gemplus, thereby resulting in the precipitous decline of Gemplus's stock value.

149.    The substantial instability that resulted from TPG's control of Gemplus has negatively impacted the value of Gemplus shares and ADSs in the market, which have vastly underperformed the market.  By September 2002, the stock had lost 93% of its value on the Paris Exchange and 95% of its value on the NASDAQ.  By way of comparison, the NASDAQ Composite Index lost only 61% of its value and the *Premier Marché* CAC 40 lost only 36% of

its value during that period.  The stock and ADS prices have remained at depressed levels since that time.

150.     By virtue of the foregoing, TPG and Bonderman, are liable for the violation of § 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

## VIOLATIONS OF SECTION 20
## OF THE 1934 SECURITIES EXCHANGE ACT

### (AS AGAINST TPG AND DAVID BONDERMAN)

151.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

152.     For all of the reasons stated above, Gemplus violated § 10(b) of the Securities Exchange Act, and Rule 10b-5 by its acts and/or omissions.

153.     Defendants TPG and Bonderman acted as controlling persons of Gemplus, within the meaning of § 20(a) of the Securities Exchange Act as alleged herein.  By virtue of TPG's ownership position, contractual rights, and participation in Gemplus's management, Defendants TPG and Bonderman had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

154.     Defendants Bonderman and TPG were provided with or had unlimited access to the Company's public disclosures and/or other documents or statements alleged to be false and misleading and had the ability to prevent the issuance of these statements or cause the statements to be corrected.  Indeed, Defendants Bonderman and TPG directed the Company to make the false and misleading statements discussed with particularity above and therefore had complete knowledge of their misleading nature.

155.   In particular, Defendants Bonderman and TPG had direct or supervisory involvement in the day-to-day operations of the Company and therefore, are presumed to have the power or control to influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same powers or control.

156.   As set forth elsewhere herein in detail, Defendants TPG and Bonderman, by virtue of their control over the IPO process, including the preparation of the Registration Statement and prospectus, had actual knowledge of the true facts regarding Gemplus, its business practices, and finances, and their control over Gemplus's business.  TPG, through Bonderman, Dechet, Halpern and others, were thus active and culpable participants in the fraudulent scheme alleged herein.  The ongoing fraudulent scheme described in this Amended Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of these individuals who are managing partners of TPG.

157.   By virtue of Bonderman's position as principal of TPG, Bonderman directed TPG, had the power to influence and control TPG, and did in fact influence and control, directly or indirectly, the decision-making of TPG, in particular with respect to TPG's management, operations, and control over Gemplus.

158.   By virtue of their positions as controlling persons of Gemplus, Defendants Bonderman and TPG are liable pursuant to § 20(a) of the Securities Exchange Act.

159.   As a direct and proximate result of Gemplus's misstatements, omissions, and actions, as directed by Defendants TPG and Bonderman, Plaintiffs have sustained significant damages in connection with their purchases of the Company's securities to be determined at trial.

## COUNT III

## COMMON LAW FRAUD

### (AS AGAINST TPG AND DAVID BONDERMAN)

160. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

161. For all of the reasons set forth in Counts I and II above, defendants TPG and Bonderman are liable in common law fraud to plaintiffs.

162. In addition to the misstatements and omissions alleged above, Gemplus, under TPG's control, issued intentionally or recklessly false press releases from 2000 to 2002. The press releases failed to disclose or materially misrepresented:

   a.   As alleged above in paragraph 52, the true nature of the Lassus and Perez loans that exposed Gemplus to over €140 million of losses;

   b.   As alleged above in paragraph 107, an unduly positive analysis of Gemplus's finances, which was contrary to the facts known to TPG and Bonderman;

   c.   As alleged above in paragraph 108, repeating the knowingly false positive analysis described above;

   d.   As alleged above in paragraphs 109-110, misrepresenting the Company's expected earnings; and

   e.   As alleged above in paragraphs 119-120, misrepresenting the settlement with Lassus concerning repayment of loans made to him in 2000.

163. In reliance on defendants' material representations and omissions, Plaintiffs were defrauded into purchasing Gemplus shares and ADSs as set forth in this complaint. Furthermore, plaintiffs were fraudulently induced by misrepresentations and omissions in Gemplus press

releases and reports filed with the S.E.C. and A.M.F. to retain a substantial portion of the shares and ADSs, which they continue to hold today.

164.     As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

### COUNT IV

### STATUTORY FRAUD UNDER
### TEXAS BUSINESS AND COMMERCIAL CODE § 27.01(A)

### (AS AGAINST TPG AND DAVID BONDERMAN)

165.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

166.     Texas statutory law prohibits, in a transaction involving stock in a corporation, the false representation of a past or existing material fact made to a person for the purpose of inducing that person to enter into a contract.

167.     Defendants TPG and Bonderman made or directed the making of representations and/or omissions of material facts as set forth with particularity above.

168.     Defendants TPG and Bonderman knew that all of these representations and/or omissions were false, misleading, inaccurate, half-truths and/or improperly withheld from Plaintiffs and other investors.

169.     These representations and/or omissions were made to induce Plaintiffs to purchase stock, as set forth with particularity above.

170.     In reliance upon those representations, Plaintiffs entered into the Enigma Purchases and the Ebun Purchases.

171.     Plaintiffs were fraudulently induced by misrepresentations and omissions in Gemplus press releases and reports filed with the S.E.C. and A.M.F. to retain a substantial portion of the shares and ADSs, which they continue to hold today.

172.     As a direct and proximate result, Plaintiffs have been harmed and are entitled to damages to be established at trial.

**COUNT V**

**<u>CIVIL CONSPIRACY TO COMMIT FRAUD</u>**

**(AS AGAINST TPG AND DAVID BONDERMAN)**

173.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

174.     Bonderman, TPG, by and through its agents identified herein, and Gemplus conspired with one another against the Plaintiffs, by virtue of entering into or directing the entering into of the secret Shareholder's Agreement, by attempting to conceal their existence and effect or directing the concealment of their existence and effect from Plaintiffs, and by participating in or causing Gemplus to issue false and misleading press releases, which it then filed with the S.E.C. and A.M.F..

175.     Bonderman, TPG and/or Gemplus committed an overt act in furtherance of the conspiracy by directing and/or participating in the filing of a misleading and inaccurate Registration Statement, press releases and periodic filings, which misrepresented and omitted material information, as set forth with particularity above.

176.     As a direct and proximate result, Plaintiffs have been harmed and are entitled to damages to be determined at trial.

## COUNT VI

## AIDING AND ABETTING A FRAUD

## (AS AGAINST TPG AND DAVID BONDERMAN)

177.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

178.    TPG and Bonderman commanded, directed, advised, encouraged, procured, controlled, aided and/or abetted Gemplus and/or their agents to commit fraud against Plaintiffs.

179.    In particular, TPG and Bonderman advised, encouraged and/or directed Gemplus to make fraudulent and misleading statements to Plaintiffs, as set forth with particularity above.

180.    The misrepresentations and omissions directed by TPG and/or Gemplus and/or its agents were intended to cause Plaintiffs to rely on them, and Plaintiffs did rely on them as evidenced by the Enigma Purchases and the Ebun Purchases and subsequent retention of the shares.

181.    TPG and Bonderman knew that the misrepresentations and omissions made by Gemplus and/or its agents were fraudulent.

182.    The misrepresentations and omissions directed by TPG and made by Gemplus and/or its agents were either intentional or reckless when made.

183.    As a direct and proximate result, Plaintiffs have been harmed and are entitled to damages in an amount to be determined at trial.

## COUNT VII

## BREACH OF FIDUCIARY DUTY

## (AS AGAINST TPG)

184.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

185.    TPG has controlled and directed the management and operations of Gemplus since late 1999.  As such, TPG, as a controlling shareholder, owed a fiduciary duty to Plaintiffs, and other minority shareholders, during the time period relevant to this litigation.  The fiduciary duties owed by TPG to the minority shareholders of Gemplus obligated TPG not use its controlling interest solely to advance its own interests to the detriment of the corporation and other shareholders.  Furthermore, by reason of its fiduciary relationship, TPG owed to the minority shareholders a duty to make full and adequate disclosures of all material facts.

186.    TPG breached this duty by, among other things, making or causing to be made material misrepresentations and omissions in connection with Plaintiffs' purchase and retention of Gemplus shares, as discussed with particularity herein.

187.    Furthermore, TPG breached its fiduciary duties by directing the operation and management of Gemplus for their own benefit and the benefit of their agents, and to the detriment of the Plaintiffs and other minority shareholders in breach of their fiduciary duties.  The manner in which TPG breached its fiduciary duties in the exercise of its control over Gemplus is set forth in particular above.

188.    As a direct and proximate result of Bonderman and TPG's breaches of its fiduciary obligations, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT VIII

## ABUSE OF CONTROL

### (AS AGAINST TPG)

189.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

190.    As described with particularity above, Bonderman and TPG's misconduct constituted an abuse of their ability to control and influence Gemplus.

191. As a direct and proximate result of Bonderman and TPG's breaches of their fiduciary obligations, Plaintiffs have sustained significant damages to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.  As to Counts I through VI, awarding Plaintiffs compensatory damages against defendants jointly and severally in an amount to be determined at trial but not less than $75,000.

B.  As to Counts VII, and VIII, awarding Plaintiffs compensatory damages against plaintiff TPG in an amount to be determined at trial but not less than $75,000.

C.  As to all Counts, awarding Plaintiffs punitive damages.

D.  As to all Counts, awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses.

E.  As to all Counts, granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Respectfully submitted,


By:___/s/  Stephen D. Howen_____
       Stephen D. Howen
       Texas Bar No. 10117800
       Raymond E. Walker
       Texas Bar No. 24037663

FIGARI & DAVENPORT, L.L.P.
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202-3796
214/939-2000
214/939-2090 (Facsimile)

LEBOEUF, LAMB, GREENE & MACRAE LLP
Lawrence S. Hirsh*
Jay G. Safer*
Marc L. Abrams*
125 West 55th Street
New York, New York 10019-5389
(212) 424-8000
(212) 424-8500 (Facsimile)
Sean Gorman
Texas Bar No. 8218100
1000 Main Street, Suite 2550
Houston, Texas 77002
(713) 287-2000
(713) 287-2100 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS
ENIGMA HOLDINGS, INC. and
EBUN LIMITED**

*Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been electronically transmitted to the Clerk of the Court using the Court's ECF System for filing and transmittal notice of electronic filing to the attorneys and parties deemed to accept service electronically.  All other parties will be served via certified mail, return receipt requested on this 23rd day of November, 2005.


_/s/  Stephen D. Howen_
Stephen D. Howen